UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| RANDALL CLARK, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 22-cv-10931-ADB |
| | * | |
| ZWICKER & ASSOCIATES, P.C., | * | |
| KRISTINA L. HOMOLESKI, JOHN D. | * | |
| YELLIN, MIDLAND FUNDING LLC, | * | |
| MIDLAND CREDIT MANAGEMENT, | * | |
| INC., ENCORE CAPITAL GROUP, INC., | * | |
| PORTFOLIO RECOVERY ASSOCIATES, | * | |
| and SOUTHWEST CREDIT SYSTEMS, | * | |
| L.P., | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Randall Clark ("Plaintiff" or "Clark"), proceeding pro se, brings this action against Portfolio Recovery Associates ("PRA" or "Defendant")[1] for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"); the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2 ("Chapter 93A"); intrusion upon seclusion; and the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("FCRA"). Currently before the Court is PRA's

---

[1] All defendants except PRA have been previously terminated from this case. See [ECF No. 18 (Stipulation of Dismissal with Prejudice as to Zwicker & Associates P.C.); ECF No. 31 (same as to Southwest Credit Systems, L.P.); ECF No. 39 (Notice of Settlement between Randall Clark and Midland Credit Management, Inc., Midland Funding LLC, Encore Capital Group, Inc., Kristina L. Homoleski, and John D. Yellin)].

motion for summary judgment on all claims. [ECF No. 50]. For the reasons set forth below, PRA's motion is GRANTED.

## I. BACKGROUND

### A. Local Rule 56.1

Local Rule 56.1 provides that "[a] party opposing [a] motion [for summary judgment] shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions[,] and other documentation." L.R. 56.1. "Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997).

"Where a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted." Butters v. Wells Fargo Advisors, LLC, No. 10-cv-10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) (citing Swallow v. Fetzer Vineyards, 46 F. App'x 636, 638–39 (1st Cir. 2002)); see also Summers v. City of Fitchburg, 940 F.3d 133, 138 (1st Cir. 2019) ("Here, the [non-moving party] flouted Local Rule 56.1 and allowed the [moving party] to map the boundaries of the summary judgment record. Such actions have consequences, and the district court deemed the [moving party's] statement of undisputed material facts admitted. Given the clarity of Local Rule 56.1 and the important function that it serves, the district court was fully justified in limiting the summary judgment record to the four corners of the [moving party's] statement of undisputed material facts." (first

citing United States v. McNicol, 829 F.3d 77, 80–81 (1st Cir. 2016); then citing Schiffmann v. United States, 811 F.3d 519, 524–25 (1st Cir. 2016))).

Here, as part of its memorandum in support of its motion for summary judgment, PRA included a "Statement of Material Facts in Support of Defendant's Motion for Summary Judgment," which included numbered paragraphs and cited to thirty-three exhibits. [ECF No. 51 ("SOF")]. Clark did not respond to the motion, and, as a result, the Court ordered Plaintiff to "show cause, in writing by October 27, 2023, why Defendant's motion should not be granted for the reasons stated therein." [ECF No. 55]. After Plaintiff again failed to respond, "despite being afforded ample time to do so," the Court ruled on November 6, 2023, that

> all of the facts set forth in Defendant's statement of material facts, [ECF No. 51], are hereby admitted, see D. Mass. Local Rule 56.1. In addition, the Court will consider Defendant's motion for summary judgment as unopposed. See Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) ("It is well-settled that 'before granting an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law.'" (quoting López v. Corporación Azucarena de P.R., 938 F.2d 1510, 1517 (1st Cir. 1991))).

[ECF No. 56]. Plaintiff has still not responded, and the Court's ruling stands. As a result, PRA's SOF is deemed admitted and its motion is unopposed.

### B. Factual Background

The Court draws the following facts from PRA's SOF and the documents cited therein, which are undisputed. [ECF No. 51]. PRA is the owner of two credit card accounts that Plaintiff previously opened with Capital One. See [SOF ¶¶ 1, 7, 22, 28]. The claims here generally relate to Plaintiff's refusal to pay the debt owed under these accounts. See [id. ¶¶ 18, 36, 38].

#### 1. The 0138 Account

Plaintiff opened the first credit card account, ending in 0138 ("the 0138 Account"), with Capital One "[o]n or about June 11, 2019." [SOF ¶ 1]. A Customer Agreement governed the

0138 Account, which contained a "provision authorizing Capital One to sell, assign, or transfer the Plaintiff's account and the Customer Agreement without the Plaintiff's permission and without prior notice to him." [Id. ¶¶ 2–3]. The Customer Agreement stated that if the 0138 Account "was sold, assigned[,] or transferred," Clark would be responsible for "perform[ing] all of [his] obligations" on that account, including payment, to the new owner, and not to Capital One. [Id. ¶ 4]. It further "authorized Capital One, and its successors and assigns, to report information about Plaintiff's account to credit bureaus for any defaults or non-payment." [Id. ¶ 5].

After Plaintiff used the credit card to make various charges and payments, [SOF ¶ 6], around April 2021, PRA purchased the 0138 Account from Capital One, [id. ¶ 7]. Capital One sent Plaintiff a letter on April 20, 2021, informing him of the sale. [Id.]. PRA also sent Plaintiff a letter on May 1, 2021, again informing him of the sale and "identifying itself as the new owner of [the 0138 Account]." [Id. ¶ 10]. The outstanding balance on the 0138 Account at the time of the sale was $465.10. [Id. ¶ 9]. Plaintiff has made no payments towards this balance since the sale. [Id. ¶ 18]. In addition, when it purchased the 0138 Account, PRA "report[ed] on Plaintiff's credit," [id. ¶ 19], meaning that PRA "reported the debts owed on Plaintiff's credit report" and that the account was in "collection," [ECF No. 52 ("PRA Aff.") ¶ 32].

Around May 18, 2021, and again "[o]n August 2, 2021," Plaintiff made two "verbal request[s] to validate" the 0138 Account. [SOF ¶¶ 11, 14]. PRA responded to these requests on May 20, 2021, and August 4, 2021, respectively, in writing with "certain copies of documents concerning" the 0138 Account. [Id. ¶¶ 12, 15]. Plaintiff did not make any further requests regarding the 0138 Account after August 4, 2021, nor did he ever communicate "any written disputes or debt validation requests" to PRA regarding the 0138 Account. [Id. ¶¶ 16–17]. PRA

4

has also not "receive[d] any reports from the credit reporting agencies that [] Plaintiff submitted a dispute" concerning the 0138 Account between the time PRA purchased the 0138 Account and the time that Plaintiff filed this lawsuit. [Id. ¶ 20].

### 2. The 2962 Account

Plaintiff opened the second Capital One account, with an account number ending in 2962 ("the 2962 Account"), around November 13, 2018. [SOF ¶ 22]. As with the 0138 Account, see supra, the 2962 Account was governed by a Customer Agreement that contained a "provision authorizing Capital One to sell, assign, or transfer the Plaintiff's account and the Customer Agreement without the Plaintiff's permission and without prior notice to him." [Id. ¶¶ 23–24]. The Customer Agreement stated that if the 2962 Account "was sold, assigned[,] or transferred," Clark would be responsible for "perform[ing] all of [his] obligations" on that account, including payment, to the new owner, and not to Capital One. [Id. ¶ 25].[2] The Customer Agreement further "authorized Capital One, and its successors and assigns, to report information about Plaintiff's account to credit bureaus for any defaults or non-payment." [Id. ¶ 26].

After Plaintiff had made various charges and payments under the 2962 Account, [SOF ¶ 27], in June 2021, PRA purchased the 2962 Account from Capital One, [id. ¶ 28]. Capital One sent Plaintiff a letter on June 15, 2021, informing him of the sale. [Id.]. PRA also sent Plaintiff a letter on or about June 25, 2021, informing him of the sale and "identifying itself as the new owner of [the 2962 Account]." [Id. ¶ 30]. The outstanding balance on the 2962 Account at the time of sale was $497.89. [Id. ¶ 29]. Plaintiff has made no payments towards this balance since

---

[2] Paragraph 25 of the Statement of Facts references "Account Ending -0138." The Court understands this to be a typographical error and assumes that the SOF meant to refer to the 2962 Account. See, e.g., [SOF ¶ 25 (citing to PRA Aff., Ex. 9); ECF No. 52 ¶ 24 (PRA Aff. referring to Ex. 9 as being associated with the 2962 Account)].

the sale. [Id. ¶ 36]. In addition, when it purchased the 2962 Account, PRA again "report[ed] on Plaintiff's credit," [id. ¶ 39], including "report[ing] the debts owed on Plaintiff's credit report" and that the account was in "collection," [PRA Aff. ¶ 32].

As he did with the 0138 Account, see supra, around September 14, 2021, Plaintiff made a "verbal request to validate" the 2962 Account, [SOF ¶ 31], which PRA responded to in writing on September 16, 2021, with "certain copies of documents concerning" the 2962 Account, [id. ¶ 32]. Plaintiff did not make any further requests regarding the 2962 Account after September 16, 2021, nor did he ever communicate "any written disputes or debt validation requests" to PRA regarding the 2962 Account. [Id. ¶¶ 34–35]. PRA has also not "receive[d] any reports from the credit reporting agencies that [] Plaintiff submitted a dispute" concerning the 2962 Account between the time PRA purchased the 2962 Account and the time that Plaintiff filed this lawsuit. [Id. ¶ 40].

### 3. PRA's Contact with Plaintiff & Attempts to Collect Payments

Between May 2021 and June 2022, PRA placed several calls to Plaintiff in an effort to collect on the debts from both the 0138 and 2962 Accounts. [SOF ¶ 42]. Each of these calls "were in compliance with federal and state regulations and statutes as to the frequency of calls and the timing of the calls." [Id. ¶ 43]. Plaintiff "does not have any telephone records showing PRA contacted him between 2018 and 2022, and believes PRA called him because [] other debt collectors have called him in the past." [Id. ¶ 44].

In addition, between April 2021 and June 2022, PRA "conducted some 'soft pulls' or 'soft inquiries'" on the 0138 Account "to get updates on Plaintiff's contact information." [SOF ¶¶ 21, 41]. PRA did not, however, conduct any "hard pulls" or "hard inquiries" on either Account. [Id.].

"Plaintiff believes his credit was damaged" based on two events. [SOF ¶ 49]. First, Progressive Lending denied Plaintiff's application for a lease agreement on March 27, 2021, "before PRA purchased either of the Accounts" in question. [Id. ¶ 45]. That lease agreement was denied due to insufficient financial and credit history, inconsistencies with applicant information, and a "[n]umber of recent inquiries" into his credit. [Id. ¶ 46]. Second, NetCredit denied Plaintiff's credit application on September 6, 2021. [Id. ¶ 47]. That denial was based on lack of income and "applicant resid[ing] outside [the] lending area." [Id. ¶ 48]. Finally, although Plaintiff alleges that his credit was damaged, he "does not have information as to his credit score before PRA purchased the Accounts in 2021." [Id. ¶ 49].

### C. Procedural History

Plaintiff filed the operative amended complaint on September 14, 2022. [ECF No. 24 ("Amended Complaint" or "Am. Compl.")]. PRA filed its motion for summary judgment, [ECF No. 50], along with the SOF, [SOF], on September 29, 2023. Plaintiff did not oppose, and the Court deemed "all of the facts set forth in Defendant's statement of material facts . . . admitted" per Local Rule 56.1 on November 6, 2023. [ECF No. 56].

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a motion for summary judgment is unopposed, as is the case here, it "does not automatically give rise to a grant of summary judgment." Aguiar-Carrasquillo, 445 F.3d at 25. "Instead, 'the district court [is] still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate.'" Id. (internal quotation marks omitted). In so doing, the Court must draw all

reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

### III. DISCUSSION

#### A. Fair Debt Collection Practices Act (15 U.S.C. § 1692) (Count I)

The FDCPA seeks to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The statute restricts debt collectors' tactics and

communications with consumers or other individuals related to a particular debt.  See generally 15 U.S.C. §§ 1692c–1692j.  In order to prevail on a claim under the FDCPA, a plaintiff must establish that "(1) . . . [he] was the object of collection activity arising from consumer debt, (2) defendants are debt collectors as defined by the FDCPA, and (3) defendants engaged in an act or omission prohibited by the FDCPA."  O'Connor v. Nantucket Bank, 992 F. Supp. 2d 24, 30 (D. Mass. 2014) (citing Som v. Daniels L. Offs., P.C., 573 F. Supp. 2d 349, 356 (D. Mass. 2008)).

Plaintiff alleges, for example, that PRA "contacted [him] at a place and time known to be inconvenient to [him]," [Am. Compl. ¶ 40]; "used false, deceptive, or misleading representation[s] or means in connection with the collection of a debt," [id. ¶ 42]; failed to validate his debt upon written request, [id. ¶ 49]; neglected to provide a required notice of the debt upon first contact, [id. ¶ 47]; and "made a false representation to the three Consumer Reporting Agencies" regarding Plaintiff's debt, [id. ¶ 48].  Plaintiff contends these actions constitute violations of 15 U.S.C. §§ 1692c–1692g.  See [id. ¶¶ 40–49].

PRA avers that the Amended Complaint contains no allegations in Count I that specifically pertain to PRA's actions (as compared to other Defendants who have since been dismissed), and that the admitted SOF demonstrates that none of PRA's actions constitute "an act or omission prohibited by the FDCPA."  See [ECF No. 54 at 8–10].  In support of this, PRA states that the debt collection calls "were all made during reasonable hours as allowed by the FDCPA (i.e., 8:00 AM and 9:00 PM)" and that PRA received no written debt validation requests from Plaintiff.  [Id. at 10–11; SOF ¶¶ 17, 35].

There is no dispute that PRA was attempting to collect the debt owed under the 0138 and 2962 Accounts, see [Am. Compl. ¶¶ 42–45; SOF ¶ 42], or that PRA is a "debt collector" under the terms of the FDCPA, [Am. Compl. ¶ 10]; see generally [ECF No. 54].

9

Regarding whether PRA engaged in an act or omission prohibited by the FDCPA, PRA did not, for example, (1) contact Plaintiff "at any unusual time or place or a time or place known or which should be known to be inconvenient to" Plaintiff, 15 U.S.C. § 1692c(a)(1); (2) harass, oppress, or abuse Plaintiff with their debt collection activities, id. § 1692d; "use any false, deceptive, or misleading representation[s] or means" when attempting to collect the debt, id. § 1692e; (3) falsely represent "the character, amount, or legal status of any debt," id. § 1692e(2); (4) communicate "credit information that is known or which should be known to be false" to any person, id. § 1692e(8); (5) engage in "unfair or unconscionable means" when attempting to collect the debt, id. § 1692f; (6) fail to provide adequate notice of the debt within five days of first contact to Plaintiff, id. § 1692g(a); or (6) fail to cease debt collection after notice of a debt dispute, id. § 1692g(b).

Specifically, PRA is the rightful owner of the 0138 and 2962 Accounts, and can collect on those debts and report on the Accounts' status to creditors. See [SOF ¶¶ 1–7, 22–28]. Second, PRA's calls to the Plaintiff complied "with federal and state regulations and statutes as to the frequency of calls and the timing of the calls." [Id. ¶ 43]. Third, there is no evidence that PRA made false representations about the debt to a credit agency or any other entity, or that PRA engaged in any unconscionable debt collection activities. See generally [id.]. Fourth, PRA provided adequate notice of the debt by sending an "initial notification letter" for each Account, indicating the owner of the debt, amount owed, and procedures for how to dispute the debt before PRA placed any phone calls to Plaintiff. [Id. ¶¶ 10, 30 (citing ECF No. 52 Exs. 4, 10)]. Finally, PRA did not receive any written disputes or debt validation requests from Plaintiff, and thus PRA was not obligated to cease collection activities. [Id. ¶¶ 17, 35].

Accordingly, based on the allegations and the admitted facts before the Court, PRA did not engage in an act or omission prohibited by the FDCPA, and it is entitled to summary judgment on Count I.

### B.   Chapter 93A § 2 (Count II)

Under Chapter 93A, "[a] successful claim requires a showing of 1) a deceptive act or practice on the part of the defendant, 2) an injury or loss suffered by the plaintiff and 3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury." Gorbey ex rel. Maddox v. Am. J. of Obstetrics & Gynecology, 849 F. Supp. 2d 162, 165 (D. Mass. 2012) (citing Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 447–48 (D. Mass. 2012) (citing Hershenow v. Enter. Rent–A–Car Co., 840 N.E.2d 526, 532 (Mass. 2006))), aff'd sub nom. A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77 (1st Cir. 2013).

Plaintiff claims that PRA "failed to correct [his] credit report when it had proof to do so and refused to validate Plaintiff's FDCPA request," and that PRA and the other Defendants "erroneously reported on the [P]laintiff's credit report and caused the [P]laintiff to be denied credit and reduced [his] credit score." [Am. Compl. ¶¶ 55–56]. PRA avers that these allegations are insufficiently vague and do not specify what actions PRA took that violate Chapter 93A. [ECF No. 54 at 11]. They also argue that the FCRA preempts Plaintiff's Chapter 93A claim, as the FCRA "preempts state law with respect to any subject matter regulated under [it]," and that credit report violations are regulated by the FCRA. [Id. at 11–12 (citing cases)].

The Court finds that the FCRA preempts Plaintiff's 93A claim. The FCRA preempts state law "relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). Plaintiff's Chapter 93A claim relates to PRA's alleged reporting of false information to creditors and its failure to correct that false information,

11

which relates "to the responsibilities of persons who furnish information to consumer reporting agencies." Id.  Other courts have held that similar claims fall under the FCRA's purview. See, e.g., Hopkinson v. Equifax Info. Servs., LLC, No. 19-cv-12290, 2021 WL 664040, at *4, (D. Mass. Feb. 19, 2021) (finding that Chapter 93A claims premised on "unfair credit reporting, failure to correct credit information, or failure to investigate a disputed debt" were "preempted by the FCRA") (quoting Cunha v. LVNV Funding, LLC, No. 13-cv-11418, 2015 WL 573134, at *5 (D. Mass. Sept. 30, 2015)).[3]

Preemption notwithstanding, Plaintiff's claim also fails on the merits.  Plaintiff owed certain amounts on both the 0138 and 2962 Accounts at the time of PRA's purchase, and Plaintiff has not paid those debts.  [SOF ¶¶ 9, 18, 29, 36].  There is no information suggesting that there are any inaccuracies on Plaintiff's credit report relating to either the 0138 or 2962 Accounts, or that PRA ever received any information alerting them to an alleged inaccuracy.  See generally [SOF].  Thus, there is no evidence that PRA violated Section 54(A).

As a result, PRA is entitled to summary judgment on Count II.

### C. Intrusion Upon Seclusion (Count III)

"Massachusetts has never recognized a common-law cause of action for invasion of privacy," Spencer v. Roche, 755 F. Supp. 2d 250, 271 (Mass. 2010), aff'd, 659 F.3d 142 (1st Cir.

---

[3] The FCRA explicitly does not preempt claims brought under Section 54(A) of Massachusetts Chapter 93 ("Section 54(A)").  15 U.S.C. § 1681t(b)(1)(F)(i).  Section 54(A) governs duties of "[e]very person who furnishes information to a consumer reporting agency" and outlines the reasonable steps required to ensure that information's accuracy.  Mass. Gen. Laws. Ch. 93, § 54(A).  The statute also prevents debts disputed by a customer from being reported to credit agencies pending a resolution.  Id. § 54(A)(c).  Where Plaintiff's claim here relates to PRA's alleged failure to correct information it was reporting to credit reporting agencies, the Court recognizes the possibility that Plaintiff inartfully pled his cause of action under this statute.

2011), but "recognizes an actionable right of privacy" under Massachusetts General Laws ch. 214 ("Chapter 214"), Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002), which establishes that "[a] person shall have a right against unreasonable, substantial[,] or serious interference with his privacy," Mass. Gen. Laws. ch. 214, § 1(B). Accordingly, the Court will analyze Count III under Chapter 214.

"[T]he Legislature appears to have framed the statute [Chapter 214] in broad terms so that the courts can develop the law thereunder on a case-by-case basis . . . ." Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 915 (Mass. 1991) (citing Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 135 (Mass. 1984)). Although it is not fully settled which theories are actionable under the privacy statute, intrusion upon seclusion appears to be at least impliedly recognized. See Polay v. McMahon, 10 N.E.3d 1122, 1126 (Mass. 2014) ("Most of our jurisprudence under [Chapter 214] has involved public disclosure of private facts, but a plaintiff also may support a claim of invasion of privacy by showing that a defendant has intruded unreasonably upon the plaintiff's 'solitude' or 'seclusion.'"). Intrusion upon seclusion typically involves unwanted surveillance or other physical invasions, id. at 1127–28, unwanted contact constituting harassment, see Schlesinger, 567 N.E.2d at 914–15, or bodily intrusions such as drug testing, Delmonte v. Laidlaw Env. Servs., Inc., 46 F. Supp. 2d 89, 97 (D. Mass. 1999) (citing Webster v. Motorola, Inc., 637 N.E.2d 203, 205 (Mass. 1994)). "In determining whether a defendant committed an unreasonable intrusion, [courts] balance the extent to which the defendant violated the plaintiff's privacy interests against any legitimate purpose the defendant may have had for the intrusion." Polay, 10 N.E.3d at 1127.

Plaintiff alleges that PRA "intentionally intruded upon [his] right of privacy by continually harassing [him] with . . . credit pulls and false reporting on [his] credit report," [Am.

Compl. ¶ 62], and that these acts were "persistent" and "highly offensive," [id. ¶¶ 63–64]. In response, PRA states that it "had a legitimate reason for credit reporting Plaintiff's debt, as well as for its collection activities." [ECF No. 54 at 13]. PRA further contends that this claim is preempted by the FCRA, because the actions constituting the alleged violation concern credit reporting. [Id.].

The Court cannot identify any actions in the record that amount to an "unreasonable, substantial[,] or serious" infringement upon Plaintiff's right to privacy that constitutes intrusion upon seclusion. Mass. Gen. Laws. Ch. 214, § 1(B). Plaintiff specifically cites "credit pulls and false reporting on [his] credit report" as the behavior constituting intrusion upon seclusion. [Am. Compl. ¶ 62]. This behavior cannot reasonably be seen as invading Plaintiff's privacy, and there is no information in the record to suggest that there are any inaccuracies on Plaintiff's credit report relating to either the 0138 or 2962 Accounts. See generally [SOF]. Even if Plaintiff alleged that PRA's collection calls constituted intrusion upon seclusion, which he does not, see [Am. Compl. ¶¶ 58–66], any collection calls made by PRA "were in compliance with federal and state regulations and statutes as to the frequency of calls and the timing of the calls," [SOF ¶ 43]. Thus, PRA is entitled to summary judgment on Count III.

### D. Fair Credit Reporting Act (15 U.S.C. § 1681) (Count IV)

"The Fair Credit Reporting Act imposes certain obligations on entities that furnish credit information to consumer credit reporting agencies (CRAs). One such obligation is to investigate any disputes over the completeness or accuracy of the information furnished and then notify the CRA of any corrections—but only if the CRA, acting as a gatekeeper, has previously notified the furnisher of the consumer's dispute." Chiang v. MBNA, 620 F.3d 30, 30 (1st Cir. 2010) (citing 15 U.S.C. § 1681s-2). The FCRA also allows consumers to remedy inaccurate information in

their credit reports, which "can be established by 'showing that the report contained an entry or entries that . . . were either false or materially misleading.'" Meuse v. Nat'l P.I. Servs., LLC, 2022 WL 2532831, at *4 (D. Mass. July 7, 2022) (citing McIntyre v. RentGrow, Inc., 34 F.4th 87, 96 (1st Cir. 2022)).

Plaintiff alleges that PRA "has continuously reported information it knew to be false and inaccurate to all three credit reporting agencies," [Am. Compl. ¶ 70], and that PRA is responsible for "its decision to have [a prior defendant] obtain Plaintiff's credit report without a permissible purpose," [id. ¶ 68]. Plaintiff further avers that "there was no account that [PRA] had any right to collect [and/or] to have had lawful standing and authority to report on the [P]laintiff's credit reports." [Id. ¶ 73].

PRA responds that this claim is primarily directed at another defendant who has since been dismissed from the case, and any obligations PRA had to Plaintiff "would only have been triggered if the Plaintiff made a dispute with one of the three credit reporting agencies who then submitted the dispute to PRA." [ECF No. 54 at 15]. PRA further states that they were the lawful owners of the 0138 and 2962 Accounts, which gave them the right to collect on those debts, conduct soft pulls on Plaintiff's credit report, and report delinquencies to creditors. [Id. at 16].

Here, PRA purchased the 0138 and 2962 Accounts from Capital One, and as owner it may collect on the debt owed on both Accounts, pull Plaintiff's credit report, and report delinquencies to creditors. [SOF ¶¶ 1–7, 22–28]. PRA also "did not receive any reports from the credit reporting agencies" regarding Plaintiff's complaints on his credit, [id. ¶¶ 20, 40], so PRA incurred no obligation under the FCRA to investigate any reports of inaccuracies, see Chiang, 620 F.3d at 30. At the same time, there is nothing in the record demonstrating that any information on Plaintiff's credit reports related to the 0138 or 2962 Accounts is false. The only

information that PRA appears to have reported on are the undisputed outstanding balances of both accounts. See [SOF ¶¶ 18–19, 36, 39]. Therefore, PRA is entitled to summary judgment on the FCRA claim.

IV.     **CONCLUSION**

Accordingly, PRA's motion for summary judgment is GRANTED.

**SO ORDERED.**

May 7, 2024                                                         */s/ Allison D. Burroughs*
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE